**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

| | |
|---|---|
| In re:<br><br>Michael S. Singer,<br><br>      Debtor. | 09-26318-PGH<br><br>Chapter 7 |
| FEDERAL TRADE COMMISSION,<br><br>      Plaintiff,<br><br>v.<br><br>Michael S. Singer,<br><br>      Defendant. | Adversary Proceeding No. _____ |

**COMPLAINT TO DETERMINE NONDISCHARGEABILITY
OF DEBT OWED TO FEDERAL TRADE COMMISSION**

  The Federal Trade Commission ("FTC" or "Commission"), through its undersigned attorneys, brings this adversary proceeding under Section 523 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Code"), in order to obtain a determination that a pre-petition debt owed by Michael S. Singer, the debtor herein, to the FTC is nondischargeable. Michael S. Singer (the "Debtor" or "Singer") is liable to the FTC for monetary relief arising from the advertisement and sale of credit repair services to consumers. This debt is nondischargeable under 11 U.S.C. § 523(a)(2)(A).

**JURISDICTION AND VENUE**

  1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. § 523. This Adversary Proceeding is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2)(I).

2. Venue in the Southern District of Florida is proper under 28 U.S.C. § 1409(a).

3. This Adversary Proceeding relates to *In re Michael S. Singer*, Chapter 7 Case No. 09-26318-PGH (Bankr. S.D. Fla.), now pending in this Court (the "Bankruptcy Case"). The FTC is a creditor and party in interest with a claim against the Debtor pursuant to a Stipulated Judgment and Order for Permanent Injunction as to Defendant Michael Singer (the "Stipulated Judgment"). The United States District Court for the Southern District of Florida (the "District Court") entered the Stipulated Judgment in the case *Federal Trade Commission v. Ace Group, Inc., et al.*, Case No. 0:08-cv-61686-PAS (the "Enforcement Action").

4. The Stipulated Judgment includes equitable monetary relief in favor of the FTC and against the Debtor in the amount of $20,645,754.00, the amount of consumer injury claimed by the FTC pursuant to its Complaint. Based upon financial statements and supporting documents provided by the Debtor to the FTC, the District Court conditionally suspended the monetary portion of the Stipulated Judgment. The suspension of the monetary portion of the Stipulated Judgment may be terminated should the District Court determine, upon motion by the Commission, that the Debtor failed to disclose any material asset, or made any other material misrepresentation or omission in certain financial statements and supporting documents provided to the Commission. A copy of the Stipulated Judgment is attached hereto and incorporated as Exhibit 1.

5. Pursuant to Section 341 of the Bankruptcy Code, the meeting of creditors was first set for September 10, 2009. Pursuant to Rule 4007, the deadline by which the Commission must file its complaint objecting to the dischargeability of the debt owed by the Debtor to the FTC is November 9, 2009.

## THE PARTIES

6.     Plaintiff FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41 *et seq*. The Commission is charged with, *inter alia*, enforcement of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also is charged with enforcing the Credit Repair Organizations Act ("CROA"). 15 U.S.C. § l679h(a). Pursuant to Section 410(b)(1) of the CROA, 15 U.S.C. § 1679h(b)(1), any violation of any requirement or prohibition of the CROA constitutes an unfair or deceptive act or practice in commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). The Commission is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and to secure such other equitable relief as may be appropriate in each case, including rescission of contracts and restitution and disgorgement of unlawfully obtained monies. 15 U.S.C. § 53(b).

7.     Singer is the Debtor in Chapter 7 case number 09-26318 (Bankr. S.D. Fla.), now pending before this Court.

### COURSE OF PROCEEDINGS AND DEFENDANT'S CONDUCT GIVING RISE TO THE NONDISCHARGEABLE DEBT

8.     Singer was the President and sole Director of Ace Group, Inc.[1]  At all times material to the Enforcement Action, acting alone and in concert with others, Singer has formulated, directed, controlled, had the authority to control, and participated in the acts and

---

[1] ACE Group, Inc., a Delaware corporation, also conducted business as American Credit Experts, Inc., The Ace Group, Inc., The Ace Group, and ACE. ACE and Legal Credit Repair Center, Inc. ("LCRC") have operated as a common enterprise while engaging in the deceptive acts and practices and other violations of law alleged above. They have shared officers, employees, and office locations, have commingled funds, are commonly controlled, and have engaged in a common scheme. LCRC is also a defendant in the Enforcement Action.

practices of ACE and LCRC, including the acts and practices alleged in this Complaint.

9. Since at least 2003, and continuing thereafter, Debtor and his co-defendants have advertised, marketed, promoted, offered for sale, and sold credit repair services to consumers in Florida and throughout the United States. Debtor and his co-defendants have advertised their services through the Internet Web sites www.aceintake.com, www.foryourcredit.com, www.helpformycredit.com, and www.helpmycredit.com, and through pop-up Internet advertisements.

10. Through verbal representations made by Debtor's and his co-defendants' representatives and written statements on their Web sites, Debtor and his co-defendants have offered and continue to offer credit repair services purporting to remove derogatory information from, and to improve, consumers' credit records, credit histories, and credit ratings. Debtor and his co-defendants claim they have a special system of filing disputes with the major credit reporting agencies that enables them to permanently remove negative information from consumers' credit reports, including bankruptcies, late payments, charge-offs, collections, tax liens, repossessions, and judgments, even where such information is accurate and not obsolete. Debtor and his co-defendants promise to improve consumers' credit scores for a variety of purposes, including for obtaining home mortgages and car loans.

11. To attract consumers and induce them to purchase credit repair services, defendants' Web sites contain statements such as the following:

> **Through the use of systematic intelligent challenges to the three major credit bureaus ACE has a proven track record of success. With input from clients and continuous communication ACE has developed a methodology which starts to show results in as little as 60 days.**
> ***
> **Most clients need to be with ACE for a minimum of 6 to 8 months to achieve the greatest benefits from the program.**

> \*\*\*
> **It costs $59.95 to purchase, review and audit the initial reports with scores and send you highlighted copies for your records. We then charge $59.95 monthly at the conclusion of each months work. The average case takes between 6-8 months.**
> \*\*\*
> **In conclusion all you need to know is ANY ITEM ON YOUR CREDIT REPORT WHICH CAN NOT BE VERIFIED REGARDLESS OF ACCURACY MUST BE REMOVED**
> \*\*\*
> **Attempt the removal of un-verifiable negative items that are lowering your score**
> \*\*\*
> Money Back Guarantee
> \*\*\*
> If Client is in compliance with all of the terms, and there is not an improvement or removal of any one item in any of the three credit reports, after **the first** two challenge attempts and responses, ACE will refund a maximum of $119.90 to the Client. [emphasis in originals]

12. Consumers who see Debtor's and his co-defendants' Web sites or pop-up advertisements are encouraged to contact defendants via telephone or email for further information. Other consumers, who are referred to Debtor and his co-defendants by business or personal acquaintances, also contact Debtor and his co-defendants for further information.

13. Consumers interested in finding out more about Debtor's and his co-defendants' credit repair services typically leave their telephone numbers on defendants' Web sites so they can receive a return phone call, although some consumers call defendants directly. Thereafter, Debtor's and his co-defendants' representatives speak with the consumers to close the deal and arrange for payment of the advance fees. Debtor's and his co-defendants' representatives also make unsolicited phone calls to consumers.

14. In discussions with consumers, Debtor and his co-defendants promise credit repair results that equal or exceed the claims made on their Web sites. Debtor and his co-defendants typically represent that they can permanently and legally remove any negative items

contained on consumers' credit reports, even where the items are accurate and not obsolete.  In addition, Debtor and his co-defendants represent that they guarantee an improvement in the consumer's credit score and the correction or removal of at least one disputed item from any of the consumer's three credit reports after the first two months, or else they will refund the consumer's first two monthly payments.  Examples of verbal representations made by Debtor and his co-defendants to induce consumers to purchase these services, include the following statements made by different representatives for Debtor and his co-defendants to various undercover FTC investigators calling as consumers:

> ACE REPRESENTATIVE: ...Now, in the case of bankruptcies – everything surrounding your bankruptcy will be removed.  And there is probably a 75 to 80 percent chance that the word "bankrupt" will be removed from your credit report, also, and I'll tell you how that happens.  After two years, your bankruptcy is no longer kept in the courthouse.  It's sent to a federal repository.
>
> FTC UNDERCOVER:  Hmm.
>
> ACE REPRESENTATIVE:  Now, in order to verify that bankruptcy, they only have the name and address of the court.  So, they have to notify the court.  The court no longer has the records, so they have to go to the federal repository.  The federal repository has to research that information, get it back to the court and the court has to send it on to the credit bureau for verification.  Now, you have to bear in mind you're dealing with the bureaucracy of the federal government who has the federal – runs the repository.  Two, you're dealing with the bureaucracy of the court by the time they get around to doing all this information.  Plus, you have the U.S. Mail sending this stuff back and forth.  So, the odds on them getting it done in 30 days are – while it can be done – are slim.
>
> FTC UNDERCOVER:  Hmm, interesting.
>
> ACE REPRESENTATIVE:  You see.  So, and the law says if they can't verify it within 30 days.  Now –
>
> FTC UNDERCOVER:  And you're saying often, 75 to 80 percent

of the time, that may be removed from my credit report because they don't answer the verification?

ACE REPRESENTATIVE:  Exactly.

***

ACE REPRESENTATIVE:  They have to –

FTC UNDERCOVER:  To answer, right?

ACE REPRESENTATIVE:  Yeah.

FTC UNDERCOVER:  Like this is a true bankruptcy and –

ACE REPRESENTATIVE:  Right.

FTC UNDERCOVER:  -- so on and so forth.

ACE REPRESENTATIVE:  And even if they do, what we're going to do is re-challenge them because as I told you earlier –

FTC UNDERCOVER:  Um-hum.

ACE REPRESENTATIVE:  – we work under the guidance of corporate attorneys.

FTC UNDERCOVER:  Um-hum.

ACE REPRESENTATIVE:  So, if we challenge them once and they say, oh, yes, this is verified, what we do is re-challenge them again using different legal language and make them go through the steps over and over again.  Our goal is to cost the credit bureau so much money that they don't want to get involved.

FTC UNDERCOVER:  Uh-huh.  So, of course, the concern is and the question is whether it comes off permanently.  (Inaudible).

ACE REPRESENTATIVE:  That's what I said.  It's removed permanently.

***

FTC UNDERCOVER:  That's wonderful.  So, can we just talk again about the late payments?  I know you explained the bankruptcy to me.  Are you saying the late payments aren't affecting my credit or –

> ACE REPRESENTATIVE:  They are affecting your credit, but those are easy to remove.
>
> ***
>
> FTC UNDERCOVER:  Um-hum.  And this is the first biggest concern.  And her second big concern is her credit cards, you know.  She has some store credit cards and she has some major credit cards.
>
> ACE REPRESENTATIVE:  Has she been late in paying any of those credit cards?
>
> ***
>
> FTC UNDERCOVER:  (Inaudible) a month and a half and –
>
> ACE REPRESENTATIVE:  Well, we want to remove that, also.
>
> FTC UNDERCOVER:  How does it work?
>
> ACE REPRESENTATIVE:  That works the same way.  Late payments work the same . . . .
>
> ***
>
> ACE REPRESENTATIVE:  . . . . We have – we've been able to remove bankruptcies, foreclosures, judgments, charge-offs, late payments, anything negatively affecting your credit score . . . .

15. Consumers who are persuaded to use Debtor's and his co-defendants' services are asked to pay an advance fee, and usually are asked to provide their Social Security numbers so that ACE can order their credit reports. Debtor and his co-defendants typically charge consumers $39.95 to $59.95 initially, in order to start the process of disputing negative items by obtaining the consumer's credit reports and performing an "audit" of them. Debtor and his co-defendants then typically charge $59.95 monthly for their promised credit repair services, which Debtor and his co-defendants represent to consumers may take up to six to eight months for best results. This fee typically is paid by credit card or banking account debit. Debtor and his co-defendants require payment of the initial fee and the monthly fees before the promised credit

repair services are fully performed. Debtor and his co-defendants also require payment of the initial fee before they send consumers written contracts or powers of attorney to sign.

16. Following payment of these advance fees, Debtor and his co-defendants do not fulfill the promises made to consumers. Debtor's and his co-defendants' efforts consist solely of bombarding the major credit reporting agencies with repeated dispute letters submitted on behalf of consumers. These dispute letters typically contain vague, conclusory short statements about each disputed debt or bankruptcy record, with no further explanation or documentation, and the same items are typically disputed repeatedly, even after they have been verified. Debtor and his co-defendants claim to consumers that this method will eventually cause the disputed items – even accurate but negative items – to drop off of the consumers' credit reports, because each time a dispute is sent, the credit reporting agencies must ask creditors or other furnishers to verify the disputed items. Debtor and his co-defendants claim that because the creditors are busy, they often fail to respond within the time required by law, and thus the credit reporting agencies must remove the disputed items from the credit report.

17. In fact, in most instances the dispute letters submitted by Debtor and his co-defendants on behalf of consumers fail to result in the disputed items being corrected or removed from consumers' credit reports. Consumers who complain to Debtor and his co-defendants are given a variety of excuses as to why the promised results have not been achieved. Debtor and his co-defendants sometimes attempt to convince complaining consumers to stay with the program and pay additional advance fees, so that the promised credit repair can be accomplished.

18. In numerous instances, consumers' refund requests are denied by Debtor and his co-defendants, who claim such consumers are not eligible for a refund. Some consumers who

file formal complaints are unsuccessful in recovering any money from Debtor and his co-defendants.

19. The Credit Repair Organizations Act prohibits all persons from making or using any untrue or misleading representation of the services of the credit repair organization. 15 U.S.C. § 1679b(a)(3).

20. The Credit Repair Organizations Act prohibits credit repair organizations[2] from charging or receiving any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform before such service is fully performed. 15 U.S.C. § 1679b(b).

21. Pursuant to Section 410(b)(1) of the Credit Repair Organizations Act, 15 U.S.C. § 1679h(b)(1), any violation of any requirement or prohibition of the Credit Repair Organizations Act constitutes an unfair or deceptive act or practice in commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

22. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of services to consumers by a credit repair organization, as that term is defined in Section 403(3) of the Credit Repair Organizations Act, 15 U.S.C. § 1679a(3), Debtor and his co-defendants made untrue or misleading representations to induce consumers to

---

[2] The Credit Repair Organizations Act defines a "credit repair organization" as:

> [A]ny person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of . . . improving any consumer's credit record, credit history, or credit rating[.]

15 U.S.C. § 1679a(3).

purchase their credit repair services, including, but not limited to, the representation that defendants can improve substantially consumers' credit reports or profiles by permanently removing negative information from consumers' credit reports, even where such information is accurate and not obsolete.

23.     In numerous instances, in connection with their operation as a credit repair organization, as that term is defined in Section 403(3) of the Credit Repair Organizations Act, 15 U.S.C. § 1679a(3), Debtor and his co-defendants have charged or received money or other valuable consideration for the performance of credit repair services that defendants have agreed to perform before such services were fully performed.

24.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits unfair or deceptive acts or practices in or affecting commerce. Misrepresentations or omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

25.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of credit repair services, Debtor and his co-defendants represented, expressly or by implication, that they can improve substantially consumers' credit reports or profiles by permanently removing negative information from consumers' credit reports, even where such information is accurate and not obsolete.

26.     In truth and in fact, in numerous of these instances, Debtor and his co-defendants could not improve substantially consumers' credit reports or profiles by permanently removing negative information from consumers' credit reports where such information is accurate and not obsolete.

# COUNT I

## NONDISCHARGEABLE DEBT FOR MONEY OBTAINED BY FALSE PRETENSES, FALSE REPRESENTATIONS OR ACTUAL FRAUD

27. The Commission repeats and realleges the allegations in ¶¶ 1 through 26.

28. The Debtor violated Section 5 of the FTC Act, 15 U.S.C. § 45(a), and Section 404(b) of the CROA, 15 U.S.C. § 1679b(b), by his participation in a scheme to defraud consumers in connection with the offering for sale, selling, or other promotion of alleged credit repair services. In numerous instances, in the course of offering for sale, selling, or other promotion of alleged credit repair services, the Debtor obtained money from consumers by directly or indirectly, expressly or by implication:

    a. falsely representing that the Debtor and his co-defendants can permanently and legally remove any negative items contained on a consumer's credit report, even when the items are accurate and not obsolete;

    b. falsely representing that the Debtor and his co-defendants guarantee an improvement in the consumer's credit score and the correction or removal of at least one disputed item from any of the consumer's three credit reports after the first two months;

    c. charging or receiving money or other valuable consideration for the performance of credit repair services that the Debtor and his co-defendants agreed to perform before such services were fully performed; and

    d. denying consumers' refund requests and falsely representing that certain requesting consumers are not eligible for a refund.

29. The Debtor's activities described above constitute false pretenses, false representations or actual fraud.

30. Debtor is jointly and severally liable with his co-defendants in the Enforcement Action for these fraudulent misrepresentations.

31. The Debtor's activities described above were conducted with knowledge that he was engaged in a fraudulent scheme and with knowledge of the falsity of the representations in the course of that scheme, or with reckless disregard of the truth or falsity of the representations.

32. The Debtor injured consumers by knowingly engaging in a fraudulent scheme and knowingly making false representations to consumers and using false pretenses in dealing with consumers. These false representations and false pretenses were material to consumers in the course of deciding to purchase the services offered from the Debtor and his co-defendants. Consumers' reliance on the Debtor's representations was justifiable.

33. The total amount of the monies the Debtor obtained from consumers by such false pretenses, false representations or actual fraud is at least $20,645,754.00, plus applicable interest in accordance with 28 U.S.C. § 1961.

34. The Debtor's activities as described above constitute false pretenses, false representations or actual fraud as set forth in 11 U.S.C. § 523(a)(2)(A). Consequently, the Debtor's debt to the FTC is one for money, property, or services obtained by false pretenses, false representations or actual fraud, and is not dischargeable. 11 U.S.C. § 523(a)(2)(A).

**WHEREFORE**, plaintiff FTC requests that the Court:

(a) Determine that the pre-petition debt owed by the Debtor to the FTC, including the judgment entered against Debtor Michael Singer in the case *Federal Trade Commission v. ACE*

*Group, Inc., et al.*, Case No. 08-cv-61686-PAS, plus applicable interest pursuant to 28 U.S.C. § 1961, is nondischargeable;

  (b) Enter judgment against the Debtor in the amount of at least $20,645,754.00, plus applicable interest in accordance with 28 U.S.C. § 1961, which judgment is owed to the Commission, jointly and severally with his co-defendants in the Enforcement Action, but which shall remain suspended but subject to reinstatement in accordance with the terms of the Stipulated Judgment in the Enforcement Action, and find that judgment is nondischargeable; and

  (c) Grant the FTC such other and further relief as this case may require and the Court deems just and proper.

Dated: November 6, 2009      Respectfully submitted,

             **FEDERAL TRADE COMMISSION**

         By:   /s/ Kimberly L. Nelson
            Jule A. Mack, DC Bar No. 417741
            Kimberly L. Nelson, VA Bar. No. 47224
            Federal Trade Commission
            600 Pennsylvania Ave., N.W.
            Washington, D.C. 20580
            Telephone: (202) 326-3304
            Facsimile: (202) 326-2558
            Knelson@ftc.gov